**STATE**

v.

**Nicki A. NELSON.**

No. 2007–323–C.A.

Supreme Court of Rhode Island.

Nov. 13, 2009.

Jane M. McSolely, Department of Attorney General, for Plaintiff.

Catherine Gibran, Office of Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, JJ., and WILLIAMS, C.J. (ret.).

## OPINION

Justice FLAHERTY, for the Court.

Before this Court is an appeal by the defendant, Nicki A. Nelson, from judgments of conviction for operating a motor vehicle while under the influence of intoxicating liquor, resulting in serious bodily injury in violation of G.L. 1956 § 31–27–2.6 and for driving to endanger, resulting in personal injury in violation of § 31–27–1.1. This case came before the Supreme Court for oral argument on October 6, 2009, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the parties' arguments and considering memoranda submitted by counsel, we are satisfied that cause has not been shown, and we proceed to decide the appeal at this time without further briefing or argument. For the reasons set forth in this opinion, we vacate the judgments of conviction by the Superior Court.

### Facts and Travel

On July 24, 2004, at about 3:20 in the morning, the South Kingstown Police Department received two calls that reported a pickup truck first proceeding south in the northbound lane on Route 1 and then north in the southbound lane. A police officer responding to the call observed the pickup truck as it swerved and nearly collided with another vehicle and as it traveled briefly on the grassy median. Another vehicle, a Saturn, driven by a man later identified as Stanley Bates, was moving south in the southbound lane of Route 1 in the direct path of the errant pickup truck. In the severe collision that followed, Bates sustained serious injuries that required two surgeries, and his leg was permanently disfigured as a result of the collision.

Another South Kingstown police officer responding to the call arrived soon. That

officer testified that she approached the pickup truck and opened the driver's side door to find a woman who identified herself as "Nicki" lying across the front seat of the vehicle. The officer further testified that she "was able to smell an odor of alcoholic beverage coming from her" and that it was her opinion that defendant "was under the influence of alcohol at that time." Emergency vehicles transported the driver of the pickup truck to the hospital. There, her blood was evaluated for the presence of alcohol in accordance with hospital procedure for trauma patients. The analysis revealed a blood alcohol level in the range of 0.192 percent to 0.208 percent, well above the legal limit of 0.08 percent.

The defendant, Nicki A. Nelson, was charged on May 25, 2005, with (1) operating a motor vehicle while under the influence of intoxicating liquor, and causing serious bodily injury to Stanley Bates, in violation of § 31–27–2.6 (count 1); (2) operating a motor vehicle in reckless disregard of the safety of others that caused serious bodily injury to Stanley Bates as a proximate result of operating the vehicle, in violation of § 31–27–1.1 (count 2); (3) operating a motor vehicle while knowingly having in said motor vehicle or in her possession a controlled substance, to wit, marijuana, as defined by G.L. 1956 § 21–28–1.02, in violation of § 31–27–2.4 (count 3); and (4) unlawfully, with knowledge and intent, possessing a controlled substance classified as marijuana by § 21–28–2.08, in violation of § 21–28–4.01(c)(2)(ii) (count 4).[1] On February 14, 2007, a jury returned a verdict acquitting Nelson of operating a motor vehicle while in possession of a controlled substance, but convicting her on the charges of driving under the influence and causing serious bodily injury and driving to endanger and causing serious bodily

injury. On April 27, 2007, the trial justice sentenced Nelson on count 1 to ten years to serve at the Adult Correctional Institutions, a $1,000 fine, two-year loss of license upon release, and alcohol treatment in prison, as well as restitution for Bates's incurred and continuing expenses and lost wages. For count 2, the trial justice sentenced Nelson to a suspended five-year sentence, with five years probation on the condition that Nelson undergo substance-abuse counseling upon release. Nelson filed a timely notice of appeal.

On appeal before this Court, defendant argues that her convictions should be vacated because (1) the trial justice erred when he denied a defense motion for a mistrial after a prospective juror made an inappropriate comment during the voir dire; (2) the trial justice erred in admitting the evidence of the blood-alcohol-level analysis done at South County Hospital because of an insufficient showing of chain of custody of the blood specimen; and (3) the trial justice erred when he questioned two of the state's witnesses, John B. Kettelle, M.D. and Mr. Dennis Hilliard.

### Standard of Review

The trial justice is vested with considerable discretion when ruling on a motion to pass a case and declaring a mistrial. *State v. LaPlante*, 962 A.2d 63, 70 (R.I.2009). Thus, this Court will reverse the trial justice's ruling only if it was clearly wrong. *State v. Mendoza*, 889 A.2d 153, 158 (R.I.2005). We afford the ruling such deference because the trial justice has a "front-row seat" at the trial, allowing the trial justice to "best determine the effect of the improvident remarks upon the jury." *State v. Figueroa*, 673 A.2d 1084, 1091 (R.I.1996) (quoting *State v. Tempest*, 651 A.2d 1198, 1207 (R.I.1995)). There-

---

1. The trial justice found that count 4 merged with count 3 and dismissed count 4.

fore, the trial justice's determinations about the remarks' prejudicial quality and whether to conduct an individual voir dire of each juror to determine his or her ability to render a fair and impartial verdict also are reviewed under an abuse-of-discretion standard. *State v. Ramirez*, 936 A.2d 1254, 1267–68 (R.I.2007); *State v. Gomes*, 690 A.2d 310, 315 (R.I.1997) (citing *State v. Taylor*, 423 A.2d 1174, 1175 (R.I. 1980)); *State v. Carmody*, 471 A.2d 1363, 1366 (R.I.1984). Overall, "the conduct of a trial is within the sound discretion of the trial justice." *State v. Giordano*, 440 A.2d 742, 745 (R.I.1982) (citing *Padula v. Machado*, 416 A.2d 1184 (R.I.1980); *Pucci v. Algiere*, 106 R.I. 411, 261 A.2d 1 (1970)).

## Analysis

### I

#### Juror's Comment

On the first day of jury selection, the trial justice questioned prospective jurors on whether any circumstances existed that would affect their "ability to be fair and impartial in this case." After questioning a number of prospective jurors, the trial justice asked Juror 29 whether she had "heard the questions already asked" and did she "have a response to any of them." She replied in the affirmative. The trial justice then asked whether she would like to be heard at sidebar or, alternatively, what was the question to which she would like to respond. Instead, she replied, "Well, I'm a college professor. I have had three students killed by drunk drivers." [2] The trial justice then promptly excused her without further questioning. Defense counsel immediately moved for a mistrial. The trial justice gave a cautionary instruction to the jurors, telling them "to disregard those comments" made by Juror 29, and then he dismissed them for the day. [3] Defense counsel argued that the comment was "highly" prejudicial, apparently assuming that Juror 29 was a University of Rhode Island professor and that her deceased students had been killed in the same geographic area as pertinent in this trial. [4] Defense counsel further disput-

2. "THE CLERK: Juror Number 29 from Kingston, * * *.

"THE COURT: Good afternoon. Is it Miss, Ms., or Mrs. * * *?

"JUROR NUMBER 29: Miss.

"THE COURT: Have you heard the questions already asked?

"JUROR NUMBER 29: I have.

"THE COURT: Do you have a response to any of them?

"JUROR NUMBER 29: I do.

"THE COURT: Do you want to be heard at sidebar or what is the question that you would have a response to?

"JUROR NUMBER 29: Well, I'm a college professor. I have had three students killed by drunk drivers.

"THE COURT: That's enough, ma'am. You are excused."

3. "THE COURT: I instruct you to disregard that last comment made by Juror Number 21 [*sic*], * * *. Frankly, I don't know what prompted it. I asked her what the question was that she had a response to, without stating what the question was she had, she made that comment. It has absolutely nothing whatsoever to do with this case. As I said, this defendant is presumed to be innocent. That presumption of innocence, as I say, not only does she enjoy it now but she also enjoys it throughout the course of these proceedings and it never disappears. It only disappears if and when the State proves each and every allegation of these charges beyond a reasonable doubt. These are allegations only, subject to proof, as I say. She's entitled to a fair trial without any type of prejudicial remarks having been made. And I instruct you to disregard those comments. Put them out of your mind. They can have no consideration whatsoever; and this goes for everybody sitting in this venire, this jury panel who may be called or whose number may be selected as we go through this jury process."

4. The defense assumed that Juror 29 was a professor at the University of Rhode Island in Kingston, located in the area where the acci-

ed that a curative instruction would be effective because the "inflammatory statement" had "contaminate[d]" the panel by suggesting "that we have to do something about these drunk drivers driving around, and * * * here is your opportunity." Defense counsel also stressed that, as a practical matter, the motion to pass should be granted given the early stage of the trial. The trial justice observed, however, that there were not enough available jurors to simply begin anew the next day if the motion was granted. The state maintained that a mistrial was not warranted and that the trial justice's curative instruction to the jury to disregard the comment was sufficient because the comment did not "point any finger at this defendant."

The next day, before the jurors were brought into the courtroom, the trial justice denied the motion to pass. Even in doing so, he characterized Juror 29's unresponsive comment as "emotionally" and "almost vindictively" delivered. Nonetheless, he ruled that the comment would not "prevent[ ] [the jurors'] calm and dispassionate evaluation of the evidence." [5] However, the trial justice acknowledged on

the record that he may "revisit the issue" after he asked the jurors whether they could follow his cautionary instruction to disregard the comment. The trial justice then addressed the jury panel as a group, rather than individually, precipitating another objection from defendant. The trial justice asked the prospective jurors whether they would be able to follow his cautionary instruction from the day before, and he received an affirmative response.[6] The trial then proceeded until its conclusion on February 14, 2007.

On appeal, Nelson argues that the trial justice erred when he denied her motion to pass the case because Juror 29's comment was "incendiary" and prejudicial because it encouraged the jury to convict the defendant. Nelson further contends that the trial justice should have conducted individual voir dires with the jurors to discuss privately with them whether they were able to follow his cautionary instruction, rather than question the panel as a group. Nelson also argues, however, that no instruction could cure the prejudicial effect of the statement on the jury because the statement was particularized to suggest

---

dent occurred. However, the parties have indicated to this Court that she actually is a professor at Salve Regina University in Newport.

5. Moreover, the trial justice noted, no *evidence* had yet been presented.

6. The trial justice questioned the prospective jurors as follows:

"THE COURT: * * * Ladies and gentlemen, I'm going to ask you, before we continue with the jury selection, whether you are able—and I am directing this not only—I'm going to direct it first to the prospective jurors in the box—whether you are able to follow my so-called cautionary instructions which I gave you after Juror Number 29 made the comment that prompted that cautionary instruction and it resulted in her excusal as a juror from the panel. Are you

all able to follow that cautionary instruction which I gave you which is to strike that comment from your mind and give it no consideration whatsoever; and you have to decide this case, as I say, based upon a fair and impartial examination of the evidence in a so-called calm and dispassionate examination of the evidence. So are you all able to follow that instruction?
"(AFFIRMATIVE RESPONSE FROM PROSPECTIVE PANEL SEATED IN THE JURY BOX)
"* * *
"THE COURT: * * * Are there any jurors in this panel who are seated in the so-called spectator's section who, if called to serve as a juror, would be unable to follow that instruction which I gave the prospective jurors in the jury box? * * *
"(NO AFFIRMATIVE RESPONSE FROM PROSPECTIVE JURORS SEATED IN THE SPECTATOR SECTION)."

that Nelson was guilty, and therefore it was not possible for the jurors to disregard it.

The state argues that the trial justice did not err when he denied the motion to pass because Juror 29's comment merely reiterated facts that were already known to the prospective jurors, namely, that the case was about driving under the influence of alcohol. Moreover, the state contends that it was unnecessary that the trial justice conduct a voir dire of each juror individually, and thus the trial justice's "collective" questioning of the panel was not error.

We hold that the trial justice did not abuse his discretion when he denied the motion to pass following the prospective juror's inappropriate remark during the voir dire that she had had students who had been killed by drunk drivers. A new trial is not necessary "every time a juror has been placed in a potentially compromising situation." *Ramirez*, 936 A.2d at 1267–68 (quoting *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). To warrant a new trial, "the prejudicial effect of extraneous information" that has reached the jury improperly turns on "the probable effect that such information would have on an average reasonable juror." *State v. Hartley*, 656 A.2d 954, 962 (R.I.1995). The prejudicial evidence must be of a nature to "inflame the jurors' passions" to preclude "their calm and dispassionate evaluation of the evidence." *State v. Luciano*, 739 A.2d 222, 228 (R.I.1999) (citing *State v. Mastracchio*, 672 A.2d 438, 444 (R.I.1996)). If the trial justice determines that the evidence is prejudicial, the trial justice has a duty "to attempt to dispel the taint with a proper warning or cautionary instruction." *Carmody*, 471 A.2d at 1366.

Here, it is our opinion that the prospective juror's statement would not influence an average reasonable juror because the jurors already knew that defendant was charged with operating a vehicle under the influence of alcohol. *See State v. Coleman*, 909 A.2d 929, 937 (R.I.2006) (holding that judge did not abuse her discretion in refusing to grant the motion to pass when defendant himself admitted the prejudicial fact stated in the witness's improper comment); *see also State v. Lynch*, 854 A.2d 1022, 1034 (R.I.2004) (holding jurors "would not be unduly surprised or prejudiced" by defendant's daughter angrily rushing from the stand toward defendant because they already knew of the daughter's allegations of defendant's sexual abuse). Further, the statement is not of the type that would inflame the passions of the jury because it did not refer to the specific defendant nor did it imply her guilt. *See Carmody*, 471 A.2d at 1367 ("highly prejudicial" for jurors to overhear prospective juror give an opinion as to defendant's guilt); *State v. Massey*, 119 R.I. 666, 667–68, 382 A.2d 801, 802–03 (1978). In *Massey*, a prospective juror who had been at the scene of the alleged crime recounted his belief that he "bet it was a Massey," implying that defendant Massey's family was likely to commit crimes and had committed crimes before. *Massey*, 119 R.I. at 667, 668, 382 A.2d at 802, 803. This Court held that the trial justice abused his discretion in refusing to pass the case because the statement was prejudicial in that it implied that the defendant was guilty and nontestimonial statements "linking a defendant to a particular crime and inferring the commission of others are most difficult to disregard." *Id.* at 671, 382 A.2d at 804. Unlike the situation in *Massey*, the prospective juror's statement in this case did not refer to defendant at all or even intimate that defendant might be guilty.

After careful review of the transcript, it appears to us that the prospective juror, after observing the trial justice's interactions with other jurors of whom the trial justice asked whether there was anything that would prevent them from considering the case in a fair and impartial manner, simply anticipated the question once it was her turn and "jumped the gun," so to speak, in alerting the trial justice that she didn't consider herself able to evaluate the case fairly and impartially. In an emotional moment, she blurted out why she believed that she was unable to fulfill the role of a juror. Her comment concerned herself and her qualifications to be a juror, not defendant in particular.

■ Indeed, even statements in evidence that are directed to defendant may be "palliated" by a prompt curative instruction, just as that which the trial justice employed in this case. *Coleman*, 909 A.2d at 936–37. For example, in *Coleman*, the witness testified that he knew the defendant "through being in jail, you know, since we was kids." *Id.* at 935. The trial justice promptly gave a cautionary instruction and told the jury to disregard the statement. *Id.* She asked the juror whether they were able to disregard the statement, and every juror responded affirmatively. *Id.* This Court held that the cautionary instruction was sufficient to purge any "harmful effect" as a result of the testimony because the instruction highlighted the testimony's "irrelevance and impropriety" and "took the extraordinary step of ensuring that the entire jury was capable of disregarding the witness's response." *Id.* at 936–37.

The instruction in *Coleman* and by the trial justice in this case are very similar. Both instruct the jury to disregard the prejudicial statement and emphasize that the statement does not relate to the case or defendant's guilt or innocence. *See* *Coleman*, 909 A.2d at 936 n. 7 (comparing trial justice's instruction favorably to that employed in *State v. Werner*, 831 A.2d 183, 207 (R.I.2003), which, like the instruction here, used the phrase "put [the statements] out of your mind"). In contrast, the curative instruction given in *Massey*, held by this Court to be ineffective, "did not inform the potential jurors that they were not to consider the statement." *Massey*, 119 R.I. at 671, 382 A.2d at 803; *see also State v. Disla*, 874 A.2d 190, 199, 199–200 (R.I.2005) (holding "comprehensive instruction" including direction to "disregard" that statement was "sufficient * * * to fend off any prejudice"); *Carmody*, 471 A.2d at 1367 (holding curative instruction insufficient where jurors not told to disregard juror's comments). Here, the trial justice's curative instruction was prompt and comprehensive. It mirrored the instruction that was held to be sufficient in *Coleman* and likewise was sufficient to avoid any possible prejudicial effect of the prospective juror's statement about her deceased students. Therefore, it can be fairly said that the instruction "erased consideration of the statement from the jury's mind." *State v. Manfredi*, 118 R.I. 144, 149, 372 A.2d 975, 977 (1977) (citing *State v. Costa*, 111 R.I. 602, 609–10, 306 A.2d 36, 40 (1973)).

■ As *Coleman* further illustrates, an individual voir dire of each juror is not necessary for the curative remedy to be effective. *Coleman*, 909 A.2d at 935 (defense feared that individual voir dire would cause additional prejudice to the defendant by emphasizing comment); *see also Gomes*, 690 A.2d at 316 (holding that trial justice properly questioned prospective jurors as a group concerning whether the sexual abuse charges or their personal experience would prevent them from being impartial). Individual voir dire is appropriate when it is unclear whether the ju-

rors heard or read certain prejudicial statements or material and it is necessary to determine their exposure while at the same time insulating the rest of the jurors who may not have heard or read the prejudicial information. *See, e.g., Figueroa,* 673 A.2d at 1087–88 (voir dire conducted to determine whether jurors thought the witness said "heard" or "hurt"); *State v. Pusyka,* 592 A.2d 850, 852 (R.I.1991) (voir dire conducted to determine if jurors had been exposed to newspaper article about the trial). We are of the opinion that the trial justice did not abuse his discretion when he declined to conduct an individual voir dire of each juror in this case.

## II

### Chain of Custody

■ The defendant argues that the state did not adequately prove the chain of custody of Nelson's blood sample for alcohol-level testing and that the results of the analysis should not have been admitted because the uncertainty with respect to who handled and analyzed the specimen in the lab renders the results "highly questionable." The state counters that the trial justice properly included the evidence on the ground that any "inadequacies" in chain of custody went to the weight of the evidence rather than to its admissibility. The state maintains that "there is no evidence of tampering in [this] case." We agree with the state and hold that the trial justice did not err when he admitted the results of the blood analysis because the state established that it was reasonably probable that the blood specimen had not been tampered with.

· The nurse who drew Nelson's blood at the hospital testified at trial as to the procedures that he followed. He testified that he sent the bagged vials of Nelson's

blood via the hospital's pneumatic tube system directly to the laboratory for testing. The clinical laboratory scientist who was working on the morning of July 24, 2004, testified that the vials of Nelson's blood arrived in the lab to be analyzed.[7] She was unable to recall, however, whether it was she or her coworker who retrieved Nelson's blood specimen and performed the analysis. The witness testified that this information was indicated on a medical record entitled "Internal Inquiry Report." This document, however, was not located in Nelson's medical record.

■ Although a showing of a continuous chain of custody may operate as a "guarantee of the reliability," such a showing is not necessary for the introduction of physical evidence. *State v. Infantolino,* 116 R.I. 303, 312, 355 A.2d 722, 727 (1976). Physical evidence is admissible upon a showing that in all reasonable probability the evidence has not been subjected to tampering. *State v. Bracero,* 434 A.2d 286, 290 (R.I.1981). The state, however, need not "eliminate all possibility" of tampering. *Id.* A continuous chain of custody is relevant, therefore, "only to the weight of the evidence." *State v. Cohen,* 538 A.2d 151, 154 (R.I.1988).

In *Bracero,* the defendant argued that the trial justice erred in admitting a bag of cocaine because the state did not establish a chain of custody. *Bracero,* 434 A.2d at 290. The evidence arrived at the lab for testing on June 9, but was not analyzed until July 19. *Id.* Further, the toxicologists could not "state unequivocally that the evidence had *not* been tampered with" in the interim. *Id.* In *Cohen,* the defendant objected to the admission of evidence seized from a vehicle on the ground of an insufficient showing of chain of custody in which the evidence was not seized until the

---

**7.** The defendant acknowledges that up until this point the chain of custody was intact.

day after the arrest and the police did not testify about the location of the vehicle's keys from the time of arrest until the time of the seizure. *Cohen,* 538 A.2d at 154. In both cases, this Court held that the state made a sufficient showing that in all reasonable probability the evidence had not been tampered with. *Id.*; *Bracero,* 434 A.2d at 290.

By comparison, significantly less possibility of tampering is present in this case than was present in either *Bracero* or *Cohen.* Here, there is no evidence of any delay between the arrival of the blood evidence in the laboratory and the performance of the analysis. The specimen's arrival in the lab and its subsequent analysis are undisputed. The path of the vials containing Nelson's blood can be tracked from the drawing of the blood until the time the vials reached the lab by way of pneumatic tube. The only infirmity in the chain of custody is the unknown identity of the technician who retrieved the specimen and performed the analysis. Indeed, defendant presented no evidence of tampering, and in all reasonable probability, the blood specimen was not tampered with. *Bracero,* 434 A.2d at 290. Therefore, the failure of the state to identify the particular technician who performed the test properly goes to the weight of the evidence rather than its admissibility. *Cohen,* 538 A.2d at 154. We affirm the trial justice's ruling.

### III

### Trial Justice's Interrogation of Witnesses

The trial justice questioned four witnesses during the trial: Lt. William Buckley of the South Kingstown Police Department; Dr. Kettelle; a laboratory technician from South County Hospital; and Mr. Hilliard, the director of the Rhode Island State Crime Laboratory.

Defense counsel objected to the trial justice's questioning of Lt. Buckley, but the objection was not timely or sufficiently specific to preserve the issue for review, a fact conceded by defendant at oral argument. Defense counsel did not object to the questioning of the laboratory technician.

Doctor Kettelle, the physician who treated Nelson at South County Hospital on the morning of July 24, 2004, was called to the witness stand by the state. After the doctor was subjected to direct and cross-examination by counsel, the trial justice questioned Dr. Kettelle about specific pages of Nelson's fifty-five page medical record from South County Hospital, including Nelson's blood alcohol level and the practice of not conducting spinal assessments on intoxicated patients who are unable to follow commands. After questioning the doctor about the medical record, the trial justice posed the following questions:

"THE COURT: You also testified, Doctor, that you could not order a C spine at the time that you initially examined Miss Nelson, is that correct?

"THE WITNESS: No, that's not entirely correct.

"THE COURT: What was it that you said?

"THE WITNESS: Well, part of the cervical spine assessment is x-rays, and the other part is to actually examine the patient; but to examine the patient you need somebody who is cooperative and reliable because you can have normal x-rays and still have a severe injury that doesn't show up. So you have to have the patient move their head very carefully so they don't have a spinal cord injury if they had one of those types of injuries to the ligament of the neck. So you can't assess them if they are intoxi-

cated or if they had some other reason you couldn't reliably have them move their head and check for pain.

"THE COURT: So what were you able to do as far as the so-called C spine or cervical spine when you first examined Miss Nelson in the emergency room at the South County Hospital on July 24, 2004?

"THE WITNESS: We did the cervical spine x-rays on her.

"THE COURT: You did the x-rays?

"THE WITNESS: That's correct.

"THE COURT: Were you able to do the other, as you said, physical exam as far as your own examination of that area?

"THE WITNESS: No, not able to do a complete examination, no.

"THE COURT: Why was that?

"THE WITNESS: Because part of that examination is to release the collar and feel the neck for any tenderness and have the patient carefully move their head to the right and to the left and lift the chin up; and if they have any pain, then you have them stop moving and you put the collar back on.

"THE COURT: And were you able to do that with Miss Nelson?

"THE WITNESS: No, I wouldn't do that. It would be malpractice to do that.

"THE COURT: Why couldn't you?

"THE WITNESS: Because she was intoxicated.

"THE COURT: How would that effect [sic] your ability to do that examination or reliability of that exam?

"THE WITNESS: Because you need a patient that's going to be able to follow commands because you don't want them to move suddenly and end up with a spinal cord injury."

There was a brief recross-examination immediately after the trial justice's questioning of the witness, and defense counsel asked Dr. Kettelle about his opinion that defendant was intoxicated. Before the trial justice excused the witness, defense counsel conferred with the trial justice at sidebar. The next day, before the jury was brought into the courtroom, the trial justice acknowledged on the record that defense counsel had objected to his questioning of Dr. Kettelle previously, but that he had not yet been provided with an opportunity to be heard. Defense counsel then placed his objection to the trial justice's questions on the record, arguing that the questions were "hammering in" the state's points, and that therefore there was a risk that the jury would infer that defendant "must be guilty based upon the line of questions about the alcohol and the detail and nature of the questions." The trial justice noted the objection and overruled it.

The state last presented Mr. Hilliard, the director of the Rhode Island State Crime Laboratory. After both defense counsel and the state indicated that they had no further questions, the trial justice rephrased a question the prosecution previously had asked Mr. Hilliard with respect to whether he had an opinion "as to whether her blood alcohol level at the time of the crash would have been the same as the blood alcohol level by analysis of 4:25[a.m.]."[8] Over objection by defendant,

8. The prosecution posed its question as follows:
    "Q: Now, Doctor—sorry, Mr. Hilliard, hypothetically, if the automobile crash occurred at approximately 3:35 a.m. and the blood was drawn at approximately 4:25

a.m., are you able to estimate what the blood alcohol level of the person would have been at the time of the crash?
    "[DEFENSE COUNSEL]: Objection. Calls for speculation.

the witness answered that he did not have an opinion because he lacked necessary information regarding when defendant had her last drink. Immediately thereafter, counsel for both parties declined to ask the witness any follow-up questions and the state rested.

■■■■ The defendant argues that the trial justice erred when he questioned two of the state's witnesses by exceeding the scope of permitted judicial interrogation of witnesses and thereby prejudicing her. Rule 614(B) of the Rhode Island Rule of Evidence provides that, "[t]he court may interrogate witnesses, whether called by itself or a party." This Court, many years before the adoption of the Rules of Evidence, noted that "[i]n the furtherance of justice it is sometimes proper and commendable for a judge presiding in a jury trial to interrogate a witness as to relevant matters proper to be presented to the jury." *State v. Amaral*, 47 R.I. 245, 249–50, 132 A. 547, 549 (1926). It should be noted that in *Amaral* the Court was quick to add that the judge should do so with "caution" and that he or she should take pains not to reveal or appear to reveal an opinion, such as through tone of voice. *Id.* at 250, 132 A. at 549–50. Indeed, in anoth-

er case decided before the Rules of Evidence were adopted we said that "we cannot overemphasize the need for caution when the trial justice deems it necessary to question a witness." *Giordano*, 440 A.2d at 745. Since the adoption of Rule 614(B) in 1987, a trial justice's prerogative to question witnesses still is limited to inquiry that "will clarify a matter which he justifiably feels is a cause for confusion in the minds of the jurors." *State v. Figueras*, 644 A.2d 291, 293 (R.I.1994) (noting "narrow parameters" of permitted judicial questioning of witnesses) (quoting *Giordano*, 440 A.2d at 745). Further, even as to clarification, the trial justice should "first allow counsel every opportunity to refine the witness's testimony." *Giordano*, 440 A.2d at 745. Therefore, judicial interrogation of witnesses must be conducted reluctantly, cautiously, and in limited circumstances. *Id.*

### A

### Trial Justice's Interrogation of Dr. Kettelle

Before we address the merits of defendant's argument, we first must determine

"THE COURT: Based on that alone, are you able to answer that Doctor, yes or no?
"THE WITNESS: No. There would have to be additional information provided.
"Q: What other additional information?
"A: Information about the subject's drinking habits prior to the accident, of course, drinking.
"THE COURT: That's enough. Put another question."
The trial justice subsequently asked the witness the following:
"THE COURT: Mr. Hilliard, assuming that the patient, Nicki Nelson, on July 24, 2004 did not consume or ingest alcohol between the time of the motor vehicle accident at approximately 3:30 a.m. and the time of the analysis of her serum blood at approximately 4:25 a.m., do you have an opinion, yes or

no, as to a reasonable degree of scientific certainty as to whether her blood alcohol level at the time of the crash would have been the same as the blood alcohol level by analysis of 4:25 or would have been higher or would have been lower? Do you have an opinion?
"[DEFENSE COUNSEL]: Could I have an objection?
"THE COURT: Your objection is noted. You have a continuing objection to this line of questioning. Do you have an opinion, yes or no.
"THE WITNESS: No, your Honor, because additional information would be necessary.
"THE COURT: And what would that additional information be?
"THE WITNESS: The time of the last drink that Miss Nelson consumed."

if it was properly preserved for appeal.[9] With respect to the questioning of Dr. Kettelle, the state argues that the objection was not timely because defense counsel, in attempting to be courteous by not interrupting the trial justice, did not put the trial justice on notice of the objection to the questioning while it was ongoing. Further, the state argues that the trial justice was within his right to question a witness about the lengthy medical record to which the witness had been referring to clarify its contents for the jury. Nelson maintains that it is permissible, even advisable, for counsel to defer objections to the court's questioning until the court's examination is complete and the jury is not present.

### 1

### Preservation of Appeal

■■■■ We are of the opinion that defendant properly preserved this issue for review. Under the "raise-or-waive" rule, this Court will not consider appeals of issues that were not properly preserved in the lower court. *State v. Bido,* 941 A.2d 822, 828 (R.I.2008). To satisfy the rule, evidentiary objections (1) must be raised before the trial court and (2) be "sufficiently focused so as to call the trial justice's attention to the basis for said objection." *State v. Gautier,* 950 A.2d 400, 407 (R.I. 2008) (quoting *State v. Pacheco,* 763 A.2d 971, 976 (R.I.2001)). Under the specific language of Rule 614(C) of the Rhode Island Rules of Evidence, objections to interrogation by the court "may be made at the time or at the *next available opportunity when the jury is not present.*" (Emphasis added).

Defense counsel asked to be heard at sidebar promptly after the trial justice's questioning of Dr. Kettelle and before the witness was excused. At the suggestion of the trial justice, defense counsel placed his specific reasons for objection on the record the next day before the jury returned. Rule 614(C) permits the defense counsel's method of objection used here to avoid counsel being put in the position of interrupting the trial justice in front of the jury. In *Amaral,* decided before the adoption of Rule 614(C), this Court described such a predicament as "embarrassing." *Amaral,* 47 R.I. at 250, 132 A. at 550. This Court noted that counsel was forced to choose between risking the loss of the jury's favor or losing the right to object to the introduction of the evidence. *Id.* The adoption of Rule 614(C) remedied this dilemma by permitting advocates to defer their objection until the trial justice concludes the interrogation. Here, defense counsel chose to do so and thus under Rule 614(C), the objection interposed at sidebar after the questioning was timely.

■■■■ We caution that a general objection, made at the end of the trial justice's line of questioning of a witness, does not preserve the issue for review. *State v. Phommachak,* 674 A.2d 382, 389 (R.I. 1996). However, the objection here was sufficiently specific. Counsel promptly notified the trial justice of his objection and put the trial justice on notice that he objected to the line of questioning. Further, defense counsel was given the opportunity to place the reasons for objection on the record the next day before the jury was seated. He informed the trial justice that the questioning of Dr. Kettelle served to "reiterat[e] points that were already made by the State" and he was concerned that the trial justice's "adding in and going on

---

9. As the appellant conceded at oral argument, defense counsel's objection to the trial justice's questioning of Lt. Buckley was not timely or sufficiently specific to preserve the issue for review. Defense counsel did not object to the questioning of the laboratory technician.

at length at different points * * * put[ ] the defendant in harm's way where the jury might interpret your questions as suggesting that she must be guilty based upon the line of questions about the alcohol." Although the defense did not request a cautionary instruction at this time, this failure does not bar review if the request "would have *been futile or any attempt to palliate the prejudice would have been ineffective.*" State v. Briggs, 787 A.2d 479, 484 (R.I.2001) (quoting *State v. Lemon,* 478 A.2d 175, 181 (R.I.1984)) (Emphasis in original.). In our view, the trial justice's questioning of Dr. Kettelle transgressed the limits of judicial interrogation of witnesses to the extent that a curative instruction would have had an insufficient palliative effect. *See State v. Evans,* 618 A.2d 1283, 1284 (R.I.1993) (holding trial justice's curative instruction insufficient as "tenor of the trial justice's questioning contained prejudicial influences"). Therefore, defense counsel's failure to request a curative instruction does not render the objection too general, and the issue is properly before this Court. *Briggs,* 787 A.2d at 484.

### 2

### Trial Justice's Interrogation

■ We have great respect for the trial justice and recognize that he has considerable discretion in the administration of the jury trial. However, we are further of the opinion that the trial justice erred when he questioned Dr. Kettelle, that the error was prejudicial and not harmless, and that defendant's judgments of conviction must be vacated. The trial justice explained that his sole motivation in questioning Dr. Kettelle was to clarify the location of specific pages of a lengthy medical record. When the trial justice questioned Dr. Kettelle, both the manner of his interrogation and the testimony elicited from

the witness went beyond the limits of clarification. *Giordano,* 440 A.2d at 745.

■ As we repeatedly have emphasized, the parameters of judicial interrogation are narrowly confined to clarification of justifiably confusing matters for the jury. *Figueras,* 644 A.2d at 293; *Evans,* 618 A.2d at 1284; *Giordano,* 440 A.2d at 745. A trial justice may, for example, conduct a limited interrogation of a witness to inquire about the witness's height and weight at various relevant intervals. *State v. McVeigh,* 660 A.2d 269, 273–74 (R.I.1995). In *McVeigh,* this Court held that "[b]ecause neither the prosecutor nor defense counsel inquired about these subjects, this was an area that conceivably may have been a basis for confusion in the minds of the jurors." *Id.* at 274. Here, the voluminous medical record did not in and of itself lead to a conclusion that the jury was confused or that it needed clarification. Indeed, the trial justice noted after defense counsel's objection that "I didn't want the jury to be confused and that was my point in questioning Dr. Kettelle, not to * * * as you put it, place the defendant in harm's way." He apparently did not believe that the jurors *were* confused, but rather did not want them to *become* confused with respect to the fifty-five page medical record. Therefore, the trial justice's questioning of Dr. Kettelle about the medical record did not constitute clarification of a point of confusion for the jury. There seems little question to us that the trial justice's questioning prejudiced defendant. This is so because the trial justice's questioning took on an air of cross-examination and the questions twice elicited answers from the witness that he was unable to perform standard tests on defendant because of her level of intoxication. Doctor Kettelle testified that it would have been "malpractice" for him to conduct a certain examination on Nelson

because she was too drunk to cooperate. This was devastating testimony in a drunk-driving trial.

■ Judicial interrogation that elicits inflammatory information from a witness is beyond the narrow parameters allowing only for clarification of confusing issues for the jury. Here, the prosecution and defense already had questioned the witness regarding how defendant's intoxicated state affected his examination and treatment of her. Therefore, the trial justice's interrogation of Dr. Kettelle was not limited to a discrete issue left unresolved through counsels' examination. Rather, the trial justice's interrogation of Dr. Kettelle improperly served as an extension of the direct and cross-examination and went beyond acceptable limits. The questioning severely prejudiced defendant because it reinforced defendant's intoxication to the jury.

**B**

**Interrogation of Dennis Hilliard**

■ Nelson objected contemporaneously to the trial justice's questioning of Mr. Hilliard with respect to his opinion as to Nelson's relative blood alcohol level at 3:30 a.m. and 4:25 a.m. Nelson argues that the trial justice improperly asked the witness a "prosecution-oriented question" because the question tended to reveal to the jury the trial justice's partiality and belief that Nelson had a higher blood alcohol content at 3:30 a.m. than she did an hour later. The state counters that the questioning does not entitle Nelson to a new trial because the witness could not, and did not, actually provide an opinion in response, and therefore the verdict was unaffected.

In our opinion, the trial justice's interrogation of Mr. Hilliard was error and also requires us to vacate the judgments of conviction. The trial justice's questioning of Mr. Hilliard was in the same vein as his questioning of Dr. Kettelle in that it strayed from this Court's long-standing holdings that judicial questioning of witnesses must be confined to clarification of justifiably confusing matters for the jury. *See Figueras*, 644 A.2d at 293 (citing *Giordano*, 440 A.2d at 745). We emphasize that trial justices should not engage in the examination of witnesses of the kind that the trial justice conducted here.

■ This questioning roamed beyond the boundaries of appropriate clarifying judicial interrogation because the question subtly rephrased a question that the prosecution had already asked and the witness had already answered. Therefore, the jury heard for a second time that Mr. Hilliard could not form an opinion about the defendant's blood alcohol level at 3:30 a.m. compared with the established level at 4:25 a.m. without knowing when the defendant last consumed alcohol. We fail to see how this question could be characterized as a clarification of a justifiably confusing matter when the trial justice already knew exactly how the witness would respond. Clarification does not include simply editing counsel's previous questions to how the judge felt they should have been asked. *See Giordano*, 440 A.2d at 745–46 (holding that trial justice's request of a witness to explain an *answer* to a question asked on cross-examination constituted a clarification of the evidence). In our opinion the trial justice erred in his questioning of Mr. Hilliard, and the defendant was prejudiced as a result of the jury hearing the trial justice essentially cross-examine a witness, regardless of Mr. Hilliard's inability to give an opinion in response to the questioning.

## Conclusion

Accordingly, the defendant's appeal is sustained in part and denied in part and the judgments of conviction appealed from are vacated. The case is remanded to the Superior Court for a new trial.